1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

11   SUSAN CAROL REED,                          Case No.  1:12-cv-01028-SKO

12              Plaintiff,
                                                **ORDER REGARDING PLAINTIFF'S**
13       v.                                     **COMPLAINT**

14   CAROLYN W. COLVIN,
     Acting Commissioner of Social Security,
15
                Defendant.
16
     _____
17

18                            **INTRODUCTION**

19           Plaintiff Susan Carol Reed ("Plaintiff") seeks judicial review of a final decision of the

20   Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

21   for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act.  42 U.S.C.

22   § 405.  The matter is currently before the Court on the parties' briefs, which were submitted,

23   without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

24                         **FACTUAL BACKGROUND**

25           Plaintiff was born on April 8, 1947, and has a high school education as well as

26   approximately two years of college.  (Administrative Record ("AR") 28-29, 123.)    Plaintiff

27   previously worked as an office manager, reservation clerk, and casino cashier; Plaintiff stopped

28
     _____
     [1] The parties consented to the jurisdiction of the United States Magistrate Judge for all purposes.  (Docs. 8, 10.)

working as a casino cashier on October 2, 2007.  (AR 30, 48-49.)  On April 24, 2009, Plaintiff filed an application for DIB alleging disability since October 2007 due to irritable bowel syndrome; migraines; neck/back pain; bulging, peripheral neuropathy; pinched nerves; spinal stenosis; and arthritis.  (AR 136.)

**A.      Relevant Medical Evidence**

In December 2007, Plaintiff's primary care physician, James Mosson, M.D., diagnosed her with lumbar spine disease and cervical spine disease with associated neck pain.  (AR 521.)  Dr. Mosson stated that, "[a]s far as [he was] concerned, she is disabled from working as a cashier." (AR 521.)  In March 2008, Plaintiff saw Dr. Mosson for a follow-up examination.  (AR 520.)  He diagnosed Plaintiff with irritable bowel syndrome, iron deficiency anemia, stress, migraines, and hypertension.  (AR 520.)   In July 2008, Plaintiff saw Dr. Mosson for another follow-up, where he indicated that Plaintiff had multiple problems including cervical spine disease.  (AR 518.)  He noted it was difficult for Plaintiff to turn her neck, and because of her lumbar spine disease, she could not stand for any period of time.  (AR 518.)  Dr. Mosson reported that Plaintiff has degenerative joint disease involving her wrists, so she cannot perform any keyboarding work for any period of time; she has a history of irritable bowel syndrome which has led to bowel obstructions; she has recurrent gastrointestinal bleeding, the source of which is unclear; and she is depressed, which has made it difficult for her to work.  (AR 518.)

In August 2008, Cesar Duclair, M.D., a physician at the Northern California Spine Institute, took x-rays of Plaintiff's cervical spine and determined there was "no issue with spondylolisthesis or fracture," but Plaintiff did have severe degenerative disk disease at C5-6, with a degenerative spur at the inferior endplate of C5.  (AR 228.)  Dr. Duclair indicated that he was going to "send her for [a magnetic resonance imaging scan ("MRI")] of the cervical and lumbar spine."  (AR 228.)

In September 2008, Dr. Duclair reviewed the results of Plaintiff's lumbosacral spine MRI, which revealed moderate central stenosis at the L4-5 level related to a minimal degenerative spondylolisthesis with a slight posterior disk bulge in addition to hypertrophic arthritic changes of

the facets and thickening of the ligamentum flavum.[2]  (AR 226.)  The MRI also showed moderate bilateral L4-5 neural foraminal stenosis related to foraminal bulging of the disk and foraminal spurring of the facets, and degenerative disk changes at the L2-3 and L3-4 levels without evidence of central stenosis or disk herniation at these levels.  (AR 226.)  An MRI of Plaintiff's cervical spine indicated the following:

1.  Moderate central stenosis at the C4-5, C5-6, and C6-7 levels related to posterior central disk protrusions (most prominent at the C6-7 level) with dorsal ridging in the vertebral body endplates.  There is mild cord compression at the C5-6 and C6-7 levels without evidence of abdominal signal in the spinal cord at any level.  There is moderate bilateral C4-5, C5-6, and left C6-7 neural foramina stenosis related to uncinate spurring.

2.  Mild central stenosis at the C3-4 level related to dorsal ridging of the vertebral body endplates and a mild posterior disk bulge.

(AR 224.)

Dr. Duclair reviewed these results with Plaintiff and recommended an interlaminar injection.  (AR 222.)  He also indicated that his office would fit Plaintiff for a cervical collar.  (AR 222.)  On September 21, 2008, Plaintiff underwent epidural injections to treat her cervical and lumbar stenosis.  (AR 221.)

In November 2008, Plaintiff was seen for follow-up treatment with Dr. Duclair; Plaintiff reported her lower back was "doing well, but her neck was still uncomfortable."  (AR 216.)  Dr. Duclair indicated that a cervical collar would be prepared for Plaintiff; he referred Plaintiff to physical therapy for cervical traction; and he advised Plaintiff to get a traction unit at home.  (AR 216.)  Dr. Duclair also noted that if Plaintiff was not better in three months, they would "talk about sending her to a surgeon to discuss degenerative changes in her neck."  (AR 216.)  At the next follow-up visit in February 2009, Plaintiff "had no complaints" and she was "very happy with the results from her interlaminar epidural."  (AR 213.)  Dr. Duclair noted that, because Plaintiff was doing so well, she was only going to be seen on an as-needed basis.  (AR 213.)

On June 30, 2009, Plaintiff was seen for a comprehensive internal medicine evaluation with agency physician Miguel Hernandez, M.D.  Dr. Hernandez observed that Plaintiff "walked

---

[2] The ligamentum flavum are ligaments of the spine.

1  into the room without any discomfort" and did not seem to have any apparent distress.  (AR 373.)

2  Plaintiff reported that her IBS, migraine headaches, and cervical spinal stenosis prevented her

3  from standing and walking for very long or staying in one position for very long.  (AR 372.)  She

4  also stated that diarrhea affects her tremendously and she has to have a restroom readily available.

5  (AR 373.)

6      Dr. Hernandez diagnosed Plaintiff with irritable bowel syndrome, migraine headaches, and

7  cervical spinal stenosis.  (AR 374.)  Based on his examination, Dr. Hernandez opined that Plaintiff

8  could be expected to sit for six hours in an eight-hour workday; and lift and carry 50 pounds

9  occasionally and 25 pounds frequently.  He opined that Plaintiff has no environmental limitations

10  other than her irritable bowel syndrome, which requires access to restroom facilities for immediate

11  use.  Plaintiff's cervical spinal stenosis limits the rotation of her neck or looking up and down on a

12  repetitive or frequent basis.  (AR 375.)

13      In July 2009, D. Pong, M.D., a non-examining state agency physician, affirmed Dr.

14  Hernandez' opinion that Plaintiff is able to perform medium work.  (AR 380-83.)   Also in July

15  2009, Plaintiff underwent an examination with psychiatrist Manolito Castillo, M.D.  (AR 376-78.)

16  Dr. Castillo indicated that Plaintiff did well on assessment and he was unable to identify any

17  significant mental limitations.  (AR 378.)  Plaintiff reported to Dr. Castillo that her daily activities

18  included sleeping, reading, playing computer games, eating, drinking water, feeding her animals,

19  and sometimes swimming.  She was able to take care of her personal hygiene and complete tasks

20  such as rinsing dishes, sweeping, and doing laundry.  (AR 378.)  Her hobbies included reading and

21  playing computer games.  (AR 378.)

22      In February 2010, approximately eight months after Dr. Hernandez' assessment, Plaintiff

23  was seen by James A. Foland, M.D., and reported a reoccurrence of intermittent pain in her neck

24  because the cervical epidural steroid injection had not alleviated the pain as much as the lumbar

25  epidural steroid injection.  (AR 501-02.)  Dr. Foland noted that a repeat epidural steroid injection

26  would be given at C-7.  (AR 502.)

27      In March 2010, James D. Fontaine reviewed the MRIs of Plaintiff's cervical and lumbar

28  spine, noting that the MRI revealed moderate central stenosis at several levels.   (AR 500.)

Plaintiff reported that she had not had any relief with the February cervical epidural injection. (AR 500.)  Dr. Fontaine noted that Plaintiff was not having any radicular pain, and that further epidural injections were unlikely to help her much.  (AR 500.)  He indicated that she may simply need more pain management; Plaintiff would continue with hydrocodone; Dr. Fontaine would add a prescription for Ultram; and Plaintiff would follow-up for a re-evaluation in one month. (AR 500.)

In March 2010, a state agency physician, R. Bitonte, M.D., reviewed Plaintiff's medical record and found the prior opinions that Plaintiff retained the ability to perform medium work were appropriate and affirmed the previous assessments.  (AR 456.)

In April 2010, Plaintiff followed-up with Dr. Fontaine, who indicated that Plaintiff continued to have persistent neck pain that was unrelieved with conservative therapy.  (AR 499.) Although she experienced diffuse pain in her back, her neck pain is the most significant and interferes with her quality of life.  (AR 499.)  Dr. Fontaine noted that she did have significant spondylosis as shown on x-rays, and he indicated the need for an updated cervical spine MRI. (AR 499.)

In May 2010, Plaintiff underwent an MRI of her cervical spine.  (AR 496.)  The radiology report indicated the following impression:

1. Mild central canal stenosis at the C3-4 level and mild-moderate central canal stenosis at the C4-5 through C6-7 levels secondary to dorsal ridging of the vertebral body endplates with associated posterior bulges or minimal protrusions of the disk.

2. There is slight cord impingement without evidence of cord compression.

3. There is multilevel bilateral mild neural foraminal stenosis.

(AR 497.)

In June 2010, Dr. Fontaine reviewed the MRI results, and indicated that he "really did not feel [Plaintiff] needs surgery."  (AR 493.)  He noted she had "mainly axial pain," and he recommended "medical management."  (AR 493.)  Although she was reporting increased pain in her back and posterolateral hips, she had done well with a lumbar epidural injection in the past, and he recommended a transforaminal injection; he also increased her Norco prescription.

5

1  (AR 493.)  On June 18, 2010, Plaintiff underwent the transforaminal epidural injection.  (AR 494.)

2         At a July 2010 follow-up with Dr. Fontaine, he noted that Plaintiff did not have any

3  persistent radicular pain, and he recommended that she continue with medications.  (AR 492.)

4  Plaintiff reported some symptoms of buckling or transient weakness in her lower extremities that

5  had been increasing.  (AR 492.)  While Plaintiff reported chronic neck pain, her symptoms were

6  well controlled with Norco.    (AR 492.)    Dr. Fontaine recommended that she return for

7  reevaluation in 6 months, and to return earlier if she developed any persistent radicular pain or

8  paresthesias.  (AR 492.)

9  **B.      Administrative Proceedings**

10        The Commissioner denied Plaintiff's application initially and again on reconsideration (AR

11  55, 59); consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

12  (AR 76.)   Plaintiff appeared and testified at a hearing, through the assistance of counsel, on

13  December 13, 2010, in Stockton, California.  (AR 25-54.)

14        **1.      Plaintiff's Hearing Testimony**

15        Plaintiff testified she finished the 10th grade and in 2001 completed a GED.  (AR 29.)

16  Plaintiff last worked at Black Oak Casino as a cashier.  (AR 30.)  Her last day of work was on

17  October 2, 2007, but she did not go in that day because her husband had been taken to the hospital.

18  (AR 30.)  She stated that, "at that point between planning on getting out of there as disabled

19  anyway, I just decided, since I had to let them know on short notice that I couldn't come in to

20  work, I just decided to make that the cut off date."  (AR 30.)  After leaving her job, Plaintiff

21  received state disability benefits.  (AR 30.)

22        In responding to the ALJ's question whether she was having any physical pain or other

23  problems, Plaintiff explained that her entire back and neck cause her pain all the time.  In the past,

24  she had undergone left rotator cuff surgery, and she had an emergency laparotomy in September

25  2005.   Her primary care physician is Dr. Mosson, and she also reported treatment with a

26  psychiatrist.  (AR 33.)

27        She suffers side-effects from her medication including dizziness.  (AR 33.)  She lives at

28  home with her husband.  (AR 35.)  They have two dogs, including a small basset hound and a

miniature dachshund.  (AR 35.)  Her husband has not worked since 1989, and he now receives disability.  (AR 35.)  Physically, however, he is more able to "get around" than Plaintiff.  (AR 36.)  Plaintiff very rarely drives; her husband does most of the driving.  (AR 36.)  When she does any driving, typically she will go into town, which is 2 or 3 miles from her house.  (AR 36.)  She can drive if she wants to, but she chooses not to drive.  (AR 36.)  Plaintiff watches television for an hour and a half per day, uses the computer, does some vacuuming with a new, light weight vacuum cleaner, and does a lot of sweeping in her barn where she cares for her horse.  (AR 38-39.)  Although she feeds her horse, she reported she had ridden the horse only once in the year preceding the hearing.  (AR 39.)

Plaintiff went on a 14-day cruise with her husband and other family members, and they also went to Panama about three years prior to the hearing.  (AR 40.)  In 2008, she traveled to Australia and New Zealand, where she took a two week cruise.  (AR 40.)  Although she was able to fly on the plane, she had to upgrade her ticket to business class because she has restless leg syndrome and she cannot sit for any length of time.  (AR 44.)  She takes Clonazepam, which helps with the restless leg syndrome.  (AR 44.)  As it pertains to feeding her horse, she explained that the food given to the horse in the morning weighs less than 10 pounds, and the scoop of LMS Senior food that the horse is given in the evening is dispensed in a bucket that weighs about 3.5 pounds.  (AR 45.)

She traveled to her sister's house in Los Angeles three times in the prior three years, and in May 2010 she went to her sister's house for four days and then drove with her family to Laughlin, Nevada, for her sister's birthday.  (AR 41.)  She and her family "usually go to Hawaii every year," but in 2010 she instead went to Los Angeles with her two youngest grandchildren to take them to Disneyland.  (AR 42.)

In relation to her neck pain, lying down is the most comfortable position and she does this for several hours each day.  (AR 45-46.)  The medication she takes never completely alleviates the pain, and she uses an ice pack on her back and neck as well as a heating pad.  (AR 46.)  If she tries to stand and walk for a long period of time, she experiences pain in her hip that radiates down her leg into her knee, and then down into her calves and feet.  (AR 47.)

**2.     The ALJ's Decision**

On January 20, 2011, the ALJ issued a decision finding Plaintiff not disabled.  The ALJ made the following findings: (1) Plaintiff had not engaged in substantial gainful activity since October 2, 2007; (2) Plaintiff had the following severe impairments: degenerative disc disease and irritable bowel syndrome; (3) Plaintiff does not have an impairment that meets or medically equals one of the disabling impairments listed in 20 CFR Part 404, Subpart P. Appendix1; (4) Plaintiff has the Residual Functional Capacity ("RFC")[3] to perform medium work,[4] but she must have access to bathroom facilities; and (5) Plaintiff is capable of performing her past relevant work as an office manager, reservation clerk, and casino cashier.  (AR 12-14, 18-19.)

Plaintiff sought review of the ALJ's decision before the Appeals Council, but on April 24, 2012, the Appeals Council denied Plaintiff's request for review.  Thus, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

On June 22, 2012, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff contends the "ALJ failed to articulate specific and legitimate reasons for rejecting the examining physician's opinions" and "statements the ALJ relied upon did not contemplate the increase in severity of [Plaintiff's physical impairments in February 2010]."  (Doc. 13.)

**SCOPE OF REVIEW**

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, [the Commissioner determines] that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c).

1  Instead, the Court must determine whether the Commissioner applied the proper legal standards

2  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

3  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

4       "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

5  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

6  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

7  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

8  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

9  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

10  may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

11  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

12                                    **APPLICABLE LAW**

13       An individual is considered disabled for purposes of disability benefits if he is unable to

14  engage in any substantial, gainful activity by reason of any medically determinable physical or

15  mental impairment that can be expected to result in death or that has lasted, or can be expected to

16  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

17  1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

18  impairments must result from anatomical, physiological, or psychological abnormalities that are

19  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

20  such severity that the claimant is not only unable to do his previous work, but cannot, considering

21  his age, education, and work experience, engage in any other kind of substantial, gainful work that

22  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

23       The regulations provide that the ALJ must undertake a specific five-step sequential

24  analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

25  whether the claimant is currently engaged in substantial gainful activity.    20 C.F.R. §§

26  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

27  has a severe impairment or a combination of impairments significantly limiting her from

28  performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

**A.      The ALJ's Consideration of Dr. Hernandez' Opinion was Not Erroneous**

Plaintiff contends that the ALJ failed to articulate specific and legitimate reasons for rejecting a portion of Dr. Hernandez' opinion indicating that Plaintiff has a limited ability to rotate her neck and look up and down on a repetitive or frequent basis.  She claims that while the ALJ stated that this portion of the opinion was inconsistent with Plaintiff's daily activities, the way in which Plaintiff performs these activities undercuts the basis for the ALJ's finding.  (Doc. 13, 7:18-10:2.)

### 1.      Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Id.*  Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  *Id.*  If the treating or examining doctor's medical opinion is contradicted by

1  another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that

2  medical opinion, and those reasons must be supported by substantial evidence in the record.  *Id.* at

3  830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  The

4  ALJ can meet this burden by setting out a detailed and thorough summary of the facts and

5  conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Tommasetti*

6  *v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

7
8  **2.    The ALJ Provided Specific and Legitimate Reasons for Rejecting Dr. Hernandez's Postural Limitation Opinion.**

9  Plaintiff argues that, as she performs them, her daily activities are not inconsistent with Dr.

10  Hernandez' opinion that she is limited in her ability to rotate her neck, or move it up or down on a

11  frequent or repetitive basis.  For example, although Plaintiff drives a car, which would require her

12  to rotate her neck, she clarified at the hearing that she only drives short distances and she does not

13  drive frequently.  While she uses a vacuum, she does not perform this chore often and the vacuum

14  is light weight.  As it pertains to the daily task of feeding her horse, she testified that the alfalfa

15  bale fed to the horse weighs less than 10 pounds and the pelted food weighs less than 3.5 pounds.

16  Regarding her vacations, these activities have no bearing on her ability to use her neck repetitively

17  or frequently.  As such, Plaintiff contends that the ALJ's rejection of Dr. Hernandez' opinion about

18  her neck limitation as inconsistent with her reported daily activities was not supported by

19  substantial evidence.

20  Defendant argues that Plaintiff's ability to clean her yard, do "a lot of sweeping" of her

21  barn, groom horses, and maneuver bales and buckets of horse food are activities that exemplify

22  greater cervical range of motion than what Dr. Hernandez opined.  Defendant emphasizes that

23  these activities are not minor, and urges the Court to reject Plaintiff's attempt to minimize their

24  impact.  For example, the record reflects that Plaintiff is 5'5 tall and most horses are large enough

25  that Plaintiff could not care for them the way she does without significant neck movement.  (Doc

26  14, 10:1-16.)

27  Defendant also asserts that *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007) and *Vertigan v.*

28  *Halter*, 260 F.3d 1044 (9th Cir. 2001), cited by Plaintiff for the proposition that performance of

1    limited activities does not justify rejection of a disability claim, are distinguishable.  Defendant
2    maintains that both cases dealt with the claimants' credibility, not the assessment of a physician's
3    opinion.   Here, Plaintiff does not challenge the ALJ's negative credibility finding.   Further,
4    Defendant maintains that *Vertigan* is inapposite because the claimant's daily activities in that case
5    were substantially more limited than the daily activities in which Plaintiff engages.   Defendant
6    argues *Orn* is distinguishable because the activities in that case were substantially less involved
7    than those performed by Plaintiff in this case, and the physicians' opinions rejected by the ALJ in
8    *Orn* were those of treating physicians.  Dr. Hernandez is not Plaintiff's treating physician, and his
9    opinion is not accorded the same amount of weight as the treating physicians were required to be
10   given in *Orn*.  (Doc. 14, 11:9-12:10.)

11            Inconsistencies   between   a   physician's   opinion   and   a   claimant's   daily   activities   are   a
12   permissible basis to reject a physician's opinion.  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir.
13   2001) (ALJ properly rejected treating physician's opinion of disability that was inconsistent with
14   the claimant's level of activity); *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 602-03 (9th
15   Cir. 1999).[5]  Dr. Hernandez opined that Plaintiff's cervical spinal stenosis would "limit rotation
16   about the neck, looking up and down on a repetitive or frequent basis."  (AR 375.)  Given the wide
17   range of Plaintiff's daily activities, which included a large amount of physical work that arguably
18   requires neck rotation, it was reasonable for the ALJ to conclude that Plaintiff was not limited in
19   her ability to rotate her neck to the degree opined by Dr. Hernandez.  Although Plaintiff stated that
20   the bale of alfalfa she lifts to feed her horse does not weigh more than 10 pounds, and the weight
21   of the second feeding is about 3.5 pounds (AR 44-45), the weight of the food has little to do with
22   Plaintiff's ability to rotate her neck.  In contrast, daily activities such as sweeping out a barn and
23   grooming a large animal such as a horse, as well as vacuuming, washing dishes, cooking, and
24   doing laundry reasonably implicate a large degree of neck rotation and looking up and down.
25   Because Plaintiff performs these activities daily, the ALJ was also entitled to infer that Plaintiff
26   rotates her neck frequently throughout the day.

27

28   [5] *See also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (unpublished) (conflict between doctor's opinion
     and claimant's daily activities was specific and legitimate reason to discount opinion).

1    Plaintiff asserts that sweeping the barn does not require any neck movement, is not
2  performed for substantial portions of her day, and is, therefore, not evidence that supports the
3  ALJ's conclusion that Plaintiff's daily activities are inconsistent with Dr. Hernandez' opinion about
4  her neck limitation.  (Doc. 15, 5:18-6:7.)  However, considering all of Plaintiff's daily activities in
5  concert, the ALJ's interpretation is rational.   Plaintiff's daily activities include caring for her
6  personal hygiene; driving a car; doing light housework such as cooking, washing dishes, laundry,
7  and vacuuming; sweeping out the barn; feeding and caring for her horses and dogs; and
8  occasionally swimming.  (AR 17, 36-48, 378.)   Given the extent of these activities and because
9  they were performed daily, the ALJ was entitled to make an inference about Plaintiff's ability to
10 rotate her neck frequently and ascribe less weight to Dr. Hernandez' opinion in this regard. *Gontes*
11 *v. Astrue*, 913 F.Supp.2d 913, 924 (C.D. Cal. 2012) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d
12 1194, 1198 (9th Cir. 2008) (court must consider the ALJ's decision in the context of "the entire
13 record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the
14 ALJ's decision should be upheld")).  Even to the extent Plaintiff asserts the evidence is susceptible
15 to a different and more favorable interpretation, so long as the ALJ's interpretation of the evidence
16 is rational and supported by evidence, it must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679
17 (9th Cir. 2005) ("Although evidence of Burch's daily activities may also admit of an interpretation
18 more favorable to Burch, the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's
19 decision where the evidence is susceptible to more than one rational interpretation.'" (quoting
20 *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989))).

21    Finally, although Defendant asserts that Plaintiff's ability to ride her horse also belies Dr.
22 Hernandez' opinion of restricted neck movement, Plaintiff's hearing testimony clarified that she
23 does not ride her horse daily.  (AR 39.)  In fact, Plaintiff testified that she had only ridden her
24 horse once in the year prior to the hearing.  (AR 39.)  Plaintiff's horse riding, therefore, is not a
25 daily activity and does not constitute substantial evidence to support the ALJ's rejection of Dr.
26 Hernandez' opinion about Plaintiff's neck.   The ALJ, however, did not indicate that the rejection
27 of Dr. Hernandez' opinion was based on Plaintiff's ability to ride her horse; the ALJ's rejection was
28 predicated on the extent of Plaintiff's *daily* activities.

1    In sum, because of the extensive nature of Plaintiff's daily activities, which arguably

2 include a large degree of neck movement, the ALJ was entitled to discredit Dr. Hernandez' opinion

3 in this regard.

4  **B.      The ALJ Did Not Err in Assigning Controlling Weight to Portions of Drs.
             Hernandez and Pong's Opinions**

5

6    Plaintiff contends the medical assessments to which the ALJ gave great weight did not

7 contemplate the increase in severity of Plaintiff's physical impairments in February 2010.  (Doc.

8 13.)  Specifically, eight months after Dr. Hernandez issued his report and seven months after Dr.

9 Pong completed his report, Plaintiff experienced a significant recurrence of her orthopedic

10 impairments, rendering those assessments stale and not substantial evidence as to Plaintiff's

11 physical limitations after February 2010.  (Doc. 13, 10:17-13:9.)

12    Plaintiff argues that Dr. Foland's February 2010 report indicates Plaintiff's condition was

13 worsening.  (AR 501-02.)  Several weeks later, Plaintiff reported continued difficulties with such

14 activities as prolonged sitting and traveling in a car to Dr. Fontaine.  (AR 500.)  Dr. Fontaine

15 reviewed the results of Plaintiff's MRI scans, which showed mild stenosis in Plaintiff's cervical

16 spine and moderate stenosis in the lumbar spine.  (AR 500.)  Plaintiff underwent an epidural

17 injection in June 2010 for lower back pain.  Although she reported that her pain was reasonably

18 controlled by medication, it had not necessarily increased her functioning capabilities as she

19 continued to have increasing transient weakness in her lower extremities.  According to Plaintiff,

20 this evidence shows that Drs. Hernandez' and Pong's opinions do not constitute an accurate picture

21 of the extent of Plaintiff's limitations after February 2010.

22    The Commissioner notes initially that Dr. Bitonte affirmed the opinions of both Drs.

23 Hernandez and Pong in March 2010, even in light of the February 2010 records.  (*See* AR 456.)

24 As it pertains to Dr. Foland's examination of Plaintiff in February 2010, he did not detect any

25 muscle weakness, and Plaintiff's reflexes and orthopedic tests were normal.  (AR 501.)  In July

26 2010, Dr. Fontaine stated that Plaintiff was doing better with less pain, and that the injections had

27 helped her lower back pain and her neck pain was reasonably controlled with medication.

28 (AR 492.)  Further, the ALJ analyzed and discussed these 2010 medical records and did not find

1 that they weighed against the opinions of Drs. Pong and Hernandez.

2     The weight the ALJ ascribed to the opinions of Drs. Hernandez and Pong was not
3 erroneous, even in light of the subsequent 2010 medical records.  First, as the Commissioner
4 notes, the ALJ reviewed all of the 2010 medical records Plaintiff asserts show a worsening of her
5 condition.  The ALJ noted that the May 2010 MRI of Plaintiff's cervical spine showed mild to
6 moderate stenosis at C5-6 and C6-7, but her treating physician stated she did not need surgery and
7 recommended only further medical management.  (AR 16, 493.)  By June 2010, Plaintiff's neck
8 pain was reasonably controlled with an increased dosage of Norco, and the epidural injections in
9 her lumbar spine were effective in treating her low back pain.  (AR 16, 492.)

10     Also, considering the record as a whole, Plaintiff reported to her physician in March 2010
11 that she was having difficulty with prolonged sitting, such as traveling in a car.  (AR 500.)  Yet, as
12 she testified at the hearing before the ALJ, in May 2010 she drove from Sonora, California, to her
13 sister's house in Los Angeles, and then drove with her sister to Laughlin, Nevada, for her sister-in-
14 law's 60th birthday.  (AR 17.)  She also testified that in September 2010 she drove with her
15 husband and her grandchildren from Sonora, California, to Los Angeles, California, to visit
16 Disneyland.  (AR 18.)  This indicates that the pain she reported to her physician in March 2010
17 that was making it difficult for her to do any prolonged sitting was not affecting her to the same
18 degree by May 2010.  Additionally, as discussed by the ALJ, Dr. Fontaine's June 2010 record
19 states that Plaintiff was doing better with less pain, the injections had helped her lower back pain,
20 and her neck was reasonably controlled with pain medication. (AR 492.)

21     The ALJ properly assessed the opinions of Drs. Hernandez and Pong, and did not err in
22 giving them weight.  The record does not indicate that Plaintiff's condition worsened after
23 February 2010 to the degree that she became more limited than Drs. Hernandez and Pong opined.
24 The Court finds that the ALJ's decision to credit the opinions of Drs. Hernandez and Pong was not
25 erroneous and is supported by substantial evidence.

26                                     **CONCLUSION**

27     Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial
28 evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

1  DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social

2  Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn

3  W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

4

5

6  IT IS SO ORDERED.

7      Dated:   **November 25, 2013**                    **/s/ Sheila K. Oberto**
                                                UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28